IN THE

# COURT FOR THE CORRECTION OF ERRORS

OF THE

## STATE OF NEW-YORK.

---

Argued in January, and decided in September, 1830.

---

### VAN BOKKELIN vs. INGERSOLL.

A master of a ship has a *lien* upon the *freight* for *port fees, repairs, supplies and other necessary expenses* incurred in a *foreign port;* and payment thereof to the *ship owner* does not discharge such lien after notice to the consignee.

Thus, where the master, who had become responsible to the amount of upwards of $1000 for repairs, supplies, &c. at *New-Orleans,* on his return to *New-York* retained part of the cargo until payment of the freight, which part thus retained was subsequently delivered by a store keeper to the *consignee,* without the assent of the *master,* though by the direction of the *owner of the vessel,* who had received the freight from the consignee, and indemnified him against the claims of the master; *it was held,* that the master might sustain an action of *trover* against the store keeper, and that the payment of the freight to the ship owner was no bar.

The master has no lien on the freight for his *wages.*

In this case, it was also held that the sentence of a court of adimiralty adjudging the vessel and freight to the owner could not be urged by way of *estoppel* against the master, by the defendant in this cause; the latter not having been a party to the proceedings in that court, and consequently not bound by its sentence.

INGERSOLL sued Van Bokkelin in the supreme court in an action of *trover* for 50 hogsheads of tobacco, which Van Bokkelin had received of Ingersoll on storage, for account and subject to the order of Ingersoll, as expressed in a receipt giv-

NEW-YORK, en by Van Bokkelin. The following facts were found by a
Sept. 1830. special verdict: Robert Elwell, of Boston, was the owner
Van Bokkelin of a brig called the *William Henry*; Barker and Hopkins,
v. of New-York, were the agents of Elwell, who, on 3d June,
Ingersoll. 1822, engaged Ingersoll to take command of the brig as mas-
ter on a voyage to New-Orleans for a compensation of $40
per month, and all primage not exceeding five per cent.; the
vessel was consigned by *James Andrews* and by Barker and
Hopkins to John Clark at New-Orleans. On 7th June, Bar-
ker and Hopkins sold the brig to Driggs, and obtained a new
register, and on the next day, in behalf of Driggs, Barker and
Hopkins consigned the vessel to W. Kennon & Co. of New-
Orleans; in *July*, the vessel arrived at New-Orleans, and on
the 8th *August*, she commenced her return voyage to New-
York, laden with a cargo of 200 hogsheads of tobacco, ship-
ped by Kennon & Co. consigned to F. Depau, at New-York,
he paying freight at the rate of $9 per hogshead, with five
per cent. primage and average accustomed. While the vessel
was at New-Orleans, Kennon & Co. disbursed for her for *port
fees, repairs, supplies and other necessary expenses*, $1047,30,
for which Ingersoll, the master, was responsible, and which
he liquidated by giving his note for the same. The jury
found that the conduct of Ingersoll in relation to the con-
cerns of the brig was that of a judicious, prudent and careful
master. In September, the brig arrived at New-York, when
Ingersoll delivered 150 hogsheads of the tobacco to Depau,
and retained the remaining 50 hogsheads for *freight and pri-
mage*. The tobacco retained was stored with Van Bokkelin,
who, by the direction of *R. G. Shaw*, of Boston, delivered the
same to Depau, Shaw claiming to be the owner of the ves-
sel, and Depau having paid to him the whole amount of
freight and primage on the 200 hogsheads of tobacco, ac-
cording to the bill of lading, on being indemnified by Shaw.
It appeared that on the *fourth* day of June, 1822, Elwell
sold the brig *William Henry* to one *James Andrews*, and exe-
cuted to him a bill of sale; on the *seventh* day of June, Bar-
ker and Hopkins, as above stated, sold the brig to Driggs,
they having been empowered by Elwell to sell the vessel,
but previous to 7th June, their power had been revoked, of

which they had notice ; but it did not appear that Ingersoll had been apprized of such revocation ; on the 22d July, Andrews sold the brig to *Shaw.* In October, 1822, Ingersoll commenced his suit in the supreme court against Van Bokkelin, on his refusing to deliver to him the tobacco ; and in November, 1822, Shaw filed a libel in the district court of the United States against the brig, Ingersoll, Driggs and George R. Barker, a purchaser of the brig from Driggs, alleging that on 4th June, 1822, Elwell was the owner of the brig, and appointed Ingersoll master : that on 22d July, the vessel was transferred to the libellant, at which time Ingersoll continued to be master by virtue of his original appointment ; that Ingersoll, Driggs and Barker, contriving fraudulently to retain possession of the brig, refused to give her up ; that *after* the title of the libellants had accrued, they had sent her covertly to ports beyond the seas ; that she was then in the port of New-York, and about to be sent abroad again ; and that the register of the vessel was in their hands. The libel concludes by praying the court to decree possession of the brig, her tackel, apparel, furniture, register and *freight* to the libellant, and to cause him to be put in possession thereof ; and to compel Ingersoll, Barker and Driggs to pay all damages, costs and charges, and for general relief. To this libel, Ingersoll did not appear, but suffered a default ; Driggs and G. R. Barker appeared, as did also William C. Barker, the surviving partner of Barker and Hopkins, the agents of Elwell. In September, 1823, the district court made a decree adjudging *Shaw* to be the owner of the vessel, and ordering the possession of her, her tackel, apparel, furniture, register and freight to him. The jurors further found that there was due to Ingersoll for *wages,* up to the time of the discharging of the vessel at New-York on her return voyage from New-Orleans, in September, 1822, the sum of $140 ; and for *primage* on the freight of the voyage the sum of $90 ; which, together with the *disbursements* and interest from the termination of the voyage, amounted to the sum of $1448, 14 ; and if, &c. they found for the plaintiff, $1448,14 ; but if, &c. then they found the defendant not guilty.

The supreme court, after argument, gave judgment for Ingersoll for the whole amount found by the jury. See case and opinion of court, 7 *Cowen*, 670. Van Bokkelin brought a writ of error, and the cause now was argued by

*H. Bleecker*, for the plaintiff in error, who insisted upon the following points:

1. The defendant in error was a trespasser under the circumstances of this case in proceeding in defiance of the owner to New-Orleans with the brig William Henry, and putting him thereby to his possessory libel in the admiralty for the recovery of the possession of the brig. This is established by the decree in the admiralty.

2. The court below erred therefore in awarding to him as they have done, his wages as master during such his illegal detention of the vessel; this was enabling him to take advantage of his own wrong.

3. All disbursements made by him during such illegal detention were made in his own wrong, and the court below equally erred in awarding the amount of such disbursements in his favor against the dispossessed owner.

4. Upon the arrival of the brig in the port of New-York with the goods which are in controversy. in this cause, the owner under the decree of the court of admiralty had a right to take possession of her with any accession the wrong-doers had made to her in the interim. The freight in question was of that character, and by receiving it he did not legalize the proceeding of the master so as to give him a claim for wages and disbursements.

5. The action of trover brought by the master against the shipper for the recovery of the same freight was in disaffirmance of the owner's act, and such act could not properly be used in support of the master's proceedings as the court below have done in their judgment given herein.

6. The decree in the admiralty divested every possible right on the part of the master to the freight directly or incidentally, leaving him to his action against the owner for his wages and disbursements, if such action under the circumstances could be sustained.

7. But if it should be conceded for the sake of the argument, that the master's demands notwithstanding his wrongful acts, were legal and sustainable against the owner, the plaintiff in error having actually paid the freight to the owner, the master cannot sustain an action of trover against him.

8. The action of trover is founded on the supposition that the master has a right against the ship owner himself to hold the shipper's goods until the freight is paid to him, a power which, if it exists at all, must be general, and leaves the ship owner in all cases at the mercy of the master. There is no such rule of law, and the court below erred in establishing such lien in the master.

9. Although the master may hold the freight money when received by him for his general balance against the owner on the ordinary ground of a set-off, this is a very different thing from a lien on the goods themselves to coerce payment of the freight to him for such purpose; no such lien exists.

10. Such a lien if allowed according to the decision of the court below would be a source of great embarrassment to commerce. The claim of the owner and master conflicting, each having a lien, the shipper would be driven to his interpleader, and the operations of the merchant hindered and delayed.

11. The doctrine established in the court below is unsupported by any American cases, and rests merely on a *nisi prius* decision made by Lord Kenyon, which has never been sanctioned by the judges in England, but on the contrary, repeatedly and solemnly overruled.

*B. F. Butler*, for defendant in error, insisted upon the following points:

1. The defendant was lawfully employed by the acknowledged agents of the vessel, whose authority was not, and could not be questioned, and in pursuance of that employment, and the agreement made by those agents with the defendant, the voyage to New-Orleans and back was performed.

2. After the sale of the vessel by Elwell to Andrews, her direction was continued in Barker and Hopkins, and their authority was so fully recognized that Clark, at New-Orleans,

who first claimed to act as consignee, withdrew his claim, on the production of the last consignment from Barker and Hopkins to Kennon and Co.

3. If, in addition to these facts, more were requisite to establish the entire good faith with which Ingersoll acted throughout, the express finding in the verdict, "*that his conduct in relation to the concerns of the brig was that of a judicious, prudent and careful master*," must, for all the purposes of the determination here to be made, be deemed conclusive.

4. With these positions, so clearly made out by all the other facts of the case, the proceedings in the court of admiralty cannot possibly interfere. Those proceedings were commenced subsequently to this suit, and by the allegations in the libel, evidently in reference to some subsequent voyage. The libellant Shaw had no claim whatever to the vessel until nearly two months after she left New-York. The judgment of the district court was not pronounced until nearly one year after the commencement of this suit, and was only a judgment *in rem*.

5. The English authorities prior to the revolution, and for some time subsequent, show that disbursements of this character were considered a lien upon the ship, when made in the course of a foreign voyage, whether by the master or other persons, and this doctrine was never controverted by any decision until the case of *Hussey* v. *Christie*, in 1808. The decisions in the two cases occurring in England since, and relating to freight, are founded upon that, and are put upon the ground that the lien on the freight is consequential to the lien on the ship. This case is clearly distinguishable from those, and the reasoning of the court in those cases would justify the conclusion, that upon the facts here presented, a different rule even there would be adopted. The relation between the master and owner in this case was involuntary on the part of the master, implying no credit given to the owner, and the responsibilities thrown upon the master grew out of the necessities of the vessel.

6. For all the purposes of this question, the port of New-Orleans is to be considered a foreign port. All the common law and admiralty decisions in this country concur in sus-

taining the lien to the fullest extent for necessary expenditures in a foreign port; and this too, without any instrument of hypothecation or express agreement for the lien; and that the master, whenever he himself makes the expenditures or becomes responsible therefor, is entitled to his lien upon the freight, as against the owner, to the extent of his responsibilities or disbursements. The primage is a personal perquisite of the master, with which under no circumstances can the owner interfere.

7. By the civil law as adopted in France, the lien of the master upon the ship and cargo for all necessary expenditures is fully recognized, and that law being in force in the state of Louisiana, where these expenditures were made, and the consequent rights of the master accrued, it follows of course, that his claims are thus placed beyond all doubt or question.

8. The particular circumstances of this case do not require a decision of the naked question of *lien*. It is enough that the facts exhibited clearly a most just and equitable claim on the part of the defendant, growing out of responsibilities, which as a prudent and careful master he could not avoid, and in assuming which, he gave no credit to an owner whom he did not, and could not know; that neither the rights of the owner or third persons now are, or hereafter can be at all implicated. As this then is in effect a suit between the owner and master, why ought it not to be decided on principles of broad and substantial justice, applicable to all other liens, and this defendant, belonging to a class, of all others, least able to do so, saved the necessity and expense of resorting to a distant forum to enforce his rights.

The following opinions were delivered:

By the CHANCELLOR. The questions arising from the facts in this case are, 1. Whether the master was a wrong doer, so as to deprive him of any claim upon the owners or otherwise, for his wages and advances; 2. Had he any lien on the brig or freight for the wages, primage and advances, or either of them? and 3. Does the decree of the admiralty court deprive him of any right which he otherwise might have had against the defendant at the time this suit was commenced?

The master was engaged for the voyage, and was put in possession of the brig on the 3d of June, while Elwell was the owner, and when Barker and Hopkins had full power to make such a contract. If he has done nothing inconsistent with his duty as master, I can see no good reason for depriving him of his wages or advances, although the legal ownership of the brig was changed during the voyage. Perhaps the facts given in evidence might have authorized the jury in finding that, after he had notice of the transfer to Andrews, he joined with Driggs and Hopkins and Barker in obtaining a new register, and in the change of the consignment. If he did so, with knowledge of the rights of the parties, it would have been such a violation of his duty to the rightful owner of the brig as to deprive him of all claim upon him for wages or advances; but the jury have found that his conduct was that of a prudent, judicious and careful master. In the libel filed in the admiralty court, Shaw alleges that at the time of the conveyance to him, which was long after the commencement of the voyage, Ingersoll continued to be and was the master and commander of the brig, by virtue of the appointment made by Elwell. This certainly contradicts the idea that he was then wrongfully in possession under the appointment of Driggs. Although it is stated in another part of the libel that the defendants had covertly and against the will of the libellant sent the brig to ports beyond the seas, that allegation cannot be considered as relating to this voyage, because it is stated to have been done by them after his title accrued. The vessel was at New-Orleans at or about the time Shaw purchased of Andrews, having left New-York in the early part of June. The facts found by the jury do not therefore sustain the objection that Ingersoll was wrongfully in possession of the brig for this particular voyage.

It is suggested by the counsel for the master, that the advances were made at New-Orleans where the incipient right to the freight commenced, and that by the Spanish civil law, which prevailed there, the master had a lien on the brig and her freight both for his wages and advances. There might perhaps be some weight in this suggestion if the brig was owned at New-Orleans and the voyage had commenced and

terminated there. Even in such case it is doubtful whether any court in another state could *directly* enforce the lien, or what is there termed, the privilege of the master ; though it is frequently done *collaterally,* where a foreign court has the control of the fund raised by the sale of the ship, or of the proceeds of the freight, or where a remnant or surplus is to be distributed, as in the case of the Spanish ships mentioned by Judge Peters, 1 *Peter's Adm. Rep.* 229. In this case the brig was owned at Boston, and the voyage commenced and terminated at New-York, where the contract with the master was made. His rights must therefore depend upon those principles which form the basis of the maritime and commercial law here. The maritime, ecclesiastical and chancery law of England, as they existed in this state at the time of the revolution, and which have not been altered by the constitution or statutes, are of the same force and validity as that which is usually denominated the common law. If by any law in force here the master had a lien on the freight, or a right to retain the goods until the amount of his wages and disbursements were paid to him, it is the duty of all courts, to enforce and protect that right, so far as their jurisdiction and particular forms of administering relief will enable them to do it.

The right of the master to hypothecate the ship and freight and even the cargo, in a foreign port in case of necessity, for the purpose of procuring supplies or repairs to complete the voyage, is perfectly well settled ; and by the maritime law, even without any express hypothecation, those who have furnished the necessary supplies under such circumstances, or whose property has been applied to the same object by a forced loan, have a lien or privilege which may be enforced against the ship or freight by a proceeding *in rem.* It is equally well settled that the seamen or mariners have a lien for their wages and sustenance which has a preference over all other claims. *Madonna D'Idra,* 1 *Dods. Rep.* 37. But the question whether the master has a lien on the ship or freight for *supplies furnished by himself,* or on his own credit in a *foreign port,* does not appear to have been settled in England previous to the revolution which separated us from that

country. More recently, however, the English courts have decided that the master has no such lien. *Hussey* v. *Christie*, 9 *East*, 426. *Smith* v. *Plumer*, 1 *Barn. & Ald.* 575. *Atkinson* v. *Cotesworth*, 5 *Dowl. & Ryl.* 575. *The Favorite*, 2 *Rob. Adm. R.* 232.

The decisions in the courts of our own country have not been uniform as to the lien of the master, though I think the weight of authority is against the lien for *wages*, but in favor of it for *supplies* furnished by the master, or on his own personal credit, in a *foreign port*. In the case of *Gardner* v. *The Ship New Jersey*, which came before the admiralty court of the Pennsylvania district in 1806, 1 *Peter's Adm. Rep.* 223, Judge Peters, hesitatingly, allowed the master to retain out of the proceeds of the ship the amount which he had advanced for seamen's wages, *supplies* and pilotage ; but he decided against the claim of the master for his own *wages*, the creditors of insolvent owners being interested in the surplus. In the case of *The Grand Turk*, in the circuit court of the U. States for the southern district of New-York, 1 *Paine's R.* 72, Judge Livingston decided that the master had no lien for his *wages* and perquisites, but declined expressing any opinion as to his lien for advances and responsibilities in a foreign port, that part of the case being disposed of on other grounds. A similar decision was made by the supreme court of Pennsylvania in the case of *Fisher* v. *Willing*, 8 *Serg. & Rawle*, 118. In that case the decision involved the question as to the lien of the master for his wages on the freight as well as on the ship, although the question as to the lien on the freight was not discussed in the opinion of the court. The lien of the master on the freight, for *advances and responsibilities in a foreign port*, was distinctly asserted by Judge Story, in the more recent case of the ship *Packet*, 3 *Mason's Rep.* 255. He thinks that, on principle, the master is also entitled to a preference as against the ship ; though the correctness of his opinion as to both appears to be doubted by the very able and distinguished commentator on American law, 3 *Kent's Comm.* 128, 9. The only case I have been able to find of a direct adjudication in favor of the master's lien, either on the vessel or freight for his own *wages*, is that of *Lewis* v. *Han-*

*cock*, in the supreme court of Massachusetts, 11 *Mass. R.* 72. In that case it was decided that the master had a lien on the freight for his own wages as well as for advances, and that the owner had no right to receive the freight money from the shipper until the master's wages were paid. Mr. Justice Sutherland, who delivered the opinion of the court below in the case now before us, seems to think the same principle was adopted here in the case of *Milward* v. *Hallet*, 2 *Caines' Rep.* 77, and by the supreme court of the United States in *Hodgson* v. *Butts*, 3 *Cranch*, 140. But on a careful examination of the first case, it will be found that the question of lien, as between the master and his owner, did not come under discusion there ; and although it was alluded to in the argument of *Hodgson* v. *Butts*, yet, as it turned out that the mortgage from the owner to a third person was void in consequence of some legal informality, the question now under consideration was not decided. The remark of Chief Justice Marshall, near the end of the case, that the master was entitled to retain the freight for a general balance, notwithstanding any claim of the owner or his assignee, has been misunderstood. The mortgage being void, another claim was set up, arising out of a transaction which took place *after* the master had received the freight and settled with the owner ; and the chief justice evidently intended to say, that after the master had received the freight, he had a right to retain it for a general balance due him from the owner, even without his consent, and notwithstanding the claims of any subsequent assignee of the freight money.

The right of the master to retain the freight money, after it has come into his possession, for a general balance against the owner, and his lien upon the cargo to compel payment of the freight as the agent and acting in behalf of the owner, are frequently mentioned in the reports, and are sometimes confounded with the lien or claim of the master on the freight as against the owner, before it has been actually received from the shipper. The two first are in the nature of common law liens ; and if the master part with the money in the one case, or the possession of the goods in the other, the lien is gone : but the lien on the freight, as such, by the maritime

NEW-YORK,
Sept. 1830.

Van Bokkelin
v.
Ingersoll.

law which is now under discussion, is incidental to, or a consequence of the lien upon the ship ; and it may be enforced in the same manner, by a proceeding *in rem* in the admiralty courts. It is not strictly a lien or mere right to retain possession of the subject until payment of the debt charged thereon, but it is the *privilege* of the civil law, or an equitable lien which may be enforced although the claimant never was in the actual possession of the subject out of the proceeds of which satisfaction is sought. Even where the master has collected the freight, and is entitled as against his owner to retain it for his wages or advances, yet, by the maritime law, as incidental to a lien on the ship, the freight money in his hands may still be subject to many equitable liens in favor of the mariners and others, which must be satisfied before he has a right to apply it in discharge of his own claims.

In a case where the claim is for services in navigating the ship, or for advances for its safety, repairs, or other necessary expenses, I know of no principle which would give an equitable lien on the freight, except as incidental to a lien on the ship, and as a part of the proceeds or profits of the ship by way of accretion. Hence I conclude that in cases like the present, if there is no equitable lien on the ship, there cannot be on the freight. Nearly one hundred years since it was decided in England that the master had no lien on the ship for his wages ; *Kelyng's Rep.* 226 ; 2 *Barnard's Rep. K. B.* 160 ; and such now appears to be the settled law both in England and in this country. *The Favorite,* 2 *Rob. Adm. Rep.* 232, *and the cases before cited.* I think, therefore, the judgment of the supreme court was wrong, so far as it included the wages of the master. Again ; nearly half of those wages accrued during the outward voyage, while Andrews was the owner of the brig ; and if there was a lien on the freight, and not on the ship, for the payment thereof, that part should have been deducted from the outward freight which belonged to him, and not charged upon that belonging to Shaw. The primage belonged wholly to the master, by the agreement under which he took command of the brig.

The right of lien or preference, both against the ship and freight, to indemnify the master for *advances* and personal *re-*

*sponsibilities* necessarily made or incurred by him in a *for-* NEW-YORK,
Sept. 1830.

Van Bokkelin
v.
Ingersoll.
*eign port* for the safety of the ship or the successful termina-
tion of the voyage, depends upon a different principle from
that which is applicable to his *wages.* The agreement for
wages is a personal contract with the owner, and there are
no substantial grounds of equity for giving him a preference
over other creditors. Any one who is sufficiently intelligent
and discreet to discharge the responsible duties of master
must be perfectly competent to provide for his own wages in
the contract ; and the same reasons may be urged for refus-
ing him a lien for his advances in a *home port,* when his own-
ers are present or he can readily communicate with them.
On the other hand, the reasons which render it proper for
the master to hypothecate the ship and freight to procure the
necessary supplies occasioned by some unforeseen disaster
in a *foreign port,* and which by the maritime law give a lien
upon both, to persons who have furnished those supplies, or
whose property has been taken for the purpose, in the nature
of a forced loan, seem to be equally applicable to the case of
the master when the requisite supplies have been furnished
from his own property, or on the pledge of his individual cred-
it. It is said he may in such cases discharge himself from li-
ability by an actual hypothecation, or an express stipulation
against personal responsibility ; but is it consistent with sound
policy to compel the master to resort to that expedient, and
to encumber the ship at a high rate of marine interest, when
perhaps the supplies could be obtained by the application of
the private funds of the master, or raised on loan at the or-
dinary rate of interest, on his individual responsibility ? Be-
sides, the requisite funds cannot always be raised by hy-
pothecation of the ship in a foreign land ; but the master
would not be justified in breaking up a profitable voyage and
sacrificing the property of his owners, if the necessary sup-
plies could be procured by the appropriation of his private
funds or the pledge of his own credit. Where he is thus
compelled to pledge his personal credit, or apply his own
funds to save the ship and freight, by the general principles
of equity, as well as the spirit of the maritime law, he is en-
titled to a lien or preference to the same extent that a third

person would have whose property had been applied for the same purpose either by a forced loan thereof or a voluntary agreement with the master. To entitle the master to such a lien, or preference, I admit he must show a state of facts which would have justified him in pledging the owner's property to a third person; hence the furnishing supplies in a home port would not entitle him to a lien. Such I presume was the case in *Clay* v. *Snelgrove, Carth.* 518, and the *Anonymous* case mentioned by *Fortescue, Fort. Rep.* 230, where prohibitions were granted.

Although the recent decisions in England are against the master's lien, even for supplies necessarily furnished abroad, the nisi prius opinion of Lord Kenyon in 1801, *White* v. *Baring,* 4 *Esp.* 22, and the doubts of Lord Eldon in the case of *Hussey* v. *Christie,* in 1807, 13 *Ves.* 594, shew that the law was not thus settled in that country previous to the American revolution. Indeed, the English judges who certified their opinion to the lord chancellor in the last mentioned case, seem to take it for granted there can be no lien upon the ship unless there is an actual hypothecation by the master; but such is certainly not the law of the admiralty courts as at present understood. There is a very early case in the English reports, which I think in principle is hostile to these later decisions there; and shows that in one 'case, at least, the master in a foreign country or on the high seas might acquire a lien on the ship in his own favor and by his own act. I allude to the case of *Wilson* v. *Bird,* in 1694, 1 *Ld. Raym. R.* 22. In that case, the ship was taken by a French privateer, and was ransomed by the master for £300. To secure the payment of the ransom, the master did not indeed pledge his personal security, but he pledged his person, and was detained in France for the payment. Being unable to recover the money to redeem his person, by a suit against the owner of the ship, he filed a libel against the ship itself, on the ground of his implied lien thereon for his indemnity, and sentence was given in his favor. On a motion in the king's bench for a prohibition it was refused, on the ground that the master had a claim upon the ship for his redemption, although it was by his own contract. See, also, *Molloy, b.* 1, *ch.* 4, § 6, and

*Lopez* v. *Winter in chancery, Molloy,* 283. If the master can acquire a valid lien on the ship or freight, by the pledge of his person for their preservation, I see no reason why he should not have a similar lien where he pledges his personal credit or uses his own property for the same purpose in a like case of necessity. I therefore concur in the opinion expressed by Judge Peters and Mr. Justice Story in the cases before referred to, that the master has a preference or equitable claim on the ship and freight for his necessary disbursement in a foreign port, and to indemnify him against responsibilities there incurred.

Whether, under the particular circumstances of this case, the admiralty court had any jurisdiction to make a decree in relation to the freight, it is not necessary now to determine. The freight monies were never actually attached or under the control of the court. Neither Depau or Van Bokkelin were parties to the suit; and as to the freight, it was only a proceeding *in personam* between the parties thereto. The right of the master, as against Van Bokkelin, had become vested before the filing of that libel. As the latter was not a party, and would not have been bound by the decision if the sentence of the court had been in favor of the master's right, he cannot urge as an estoppel that the latter should have insisted upon his lien before that court. It is a rule of evidence that no person can have the benefit of a verdict, or of the proceedings in a suit, who would not have been prejudiced thereby if the decision had been the other way. 1 *Munf. R.* 394. 1 *Hen. & Munf.* 165.

If this court should agree with me in the opinion above expressed, the judgment of the supreme court must be reversed for the allowance of the wages of the master, although for the residue it be correct; and if the damages are so blended that they cannot be severed, a *venire de novo* must be awarded.

By Mr. Senator ALLEN. The counsel for the plaintiff in error has presented us with *eleven* points on which he relies to shew error in the decision of the court below; the substance of which are, first, that the defendant proceeded in

NEW-YORK,  defiance of the owner of the brig to New-Orleans, and there-
Sept. 1830.   fore, that he was not entitled either to his wages or dis-
Van Bokkelin  bursements.
v.
Ingersoll.       It appears by the case, however, that Ingersoll was ap-
pointed to the command of the vessel by Barker and Hop-
kins, the agents of Robert Elwell, of Boston, the then owner
of the brig.   The sale of the vessel to Driggs, although un-
authorized and fraudulent, could not have been known to be
such by Ingersoll; at least, there is no proof that he had
such knowledge, or that he knew of the revocation of the
power from Elwell to Barker and Hopkins.   The brig sailed
from New-York in June, 1822, and the sale of the vessel to
*Shaw* was on the 22d of July thereafter, about the time of
her arrival at New Orleans; the vessel left New-Orleans on
the 8th of August, only seventeen days after the sale to
Shaw.   Under these circumstances, it is hardly probable that
the captain knew of any fraud having been committed in the
sale of the vessel; and I am at a loss to perceive, therefore,
upon what evidence it is said that he proceeded on the voy-
age in defiance of the true owner, when no proof whatever
was produced on the trial of the cause that Shaw made any
attempt to communicate information to the captain that he
was the owner of the vessel; and when, if he had attempted
it, the time between the date of his purchase and the depar-
ture of the vessel from New-Orleans was scarcely sufficient
to admit of its reaching the captain before he left there.

*Second.* It is objected that the proceedings in the court of
admiralty divested the captain of every possible right to the
*freight money.*   These proceedings, as I apprehend, had
nothing to do with the claims of the captain for the disburse-
ments he made for the vessel, but were instituted for the pur-
pose of ascertaining who was the rightful owner; and the
court having decreed to Shaw the possession of the vessel, as
legal owner, he became liable to all the responsibilities inci-
dent to that character.

*Third.* It is objected that there is no rule of law which
gives the master a lien on the shipper's goods until the freight
is paid; and that the doctrine established by the court below
is unsupported by any American cases.   The responsible

NEW-YORK,
Sept. 1830.

Van Bokkelin
v.
Ingersoll.

character which the master of a ship assumes, while acting in that capacity, seems to make it necessary that he should possess all the legal and equitable powers awarded him by our courts. He is entrusted with the care and management of the ship, and is the confidential servant or agent of the owners, who are bound by every lawful contract he may make relative to the usual employment of the vessel. He is personally liable for the necessary repairs and outfits of the ship while in a foreign port; and unless by express terms he confines the credit to his owners, he is also bound for those he may order in the port where the owner resides. He is liable for damage sustained by a breach of positive orders from his owners, and for the value of goods embezzled or lost during the voyage.

The liability of the master, and the often absolute necessity of his obtaining supplies for the use of the ship, in order that she may prosecute her voyage in safety, is the reason, as I apprehend, why the law has given him the right to detain the freight money for the purpose of paying any expense he may incur for the benefit of his owner, and also to bind the ship, the goods on board of her (under certain circumstances) as well as his owners, for these expenses.

If I have not entirely misunderstood the language of the cases I have examined, the preceding is the substance of the decisions of the courts in this country, as well as in Great Britain.

In the case of *Lewis* v. *Hancock*, 11 *Mass. R.* 72, it was held that the master of a vessel in which goods are carried on freight is, by the terms of the contract, entitled to demand and receive the freight money or price at which the goods are to be carried and delivered; and he may retain the goods until the freight is paid; and when it is paid, he has the same right in the money that a factor or consignee has in the goods of the principal or consignor for whom money has been advanced, or any liabilities have been incurred, in consequence of the employment or consignment.

In the case of *Milward* v. *Hallett*, 2 *Caines' R.* 80, Judge Thompson said: " There is no doubt but the master of a vessel may make his owners personally responsible for neces-

NEW-YORK,  sary expenditures relating to the usual employment of the
Sept. 1830.  vessel. The master is held up to the world as the agent of the
Van Bokkelin  owner; and his character and situation furnish presumptive
v.  evidence of authority from the owners to act for them in such
Ingersoll.  cases." See, also, *White* v. *Baring*, 4 *Esp. R.* 22; *Hanson*
v. *Myer*, 6 *East*, 622; and *Roccus, note* 23, *p.* 31.

The cases to which I have referred, I think, establish the
following conclusions: That the master of a vessel has a lien
on the freight for any disbursements he may have made on
account of the vessel, and may retain the money until his ex-
penditures for that object are paid; and he may also keep
possession of the goods until the amount of freight has been
received by him; and although he may have delivered a part
of the goods to the consignee, he may retain the remainder
until the whole of the freight money has been paid to him;
and if the consignees of the cargo, after notice of the master's
claim, shall pay the freight to the owner, they will be liable
to refund so much as will satisfy his claim.

In the case under consideration, the defendant in error, as
master of the brig William Henry, incurs responsibilities for
the repairs and other necessary expenses of the vessel at
New-Orleans; he receives a cargo of tobacco on freight
for New-York, and on his arrival at that port, he finds a
claim set up by Shaw to the vessel and her earnings. The
defendant, having been denied the payment of his disburse-
ments and expenses on account of the vessel, by the claim-
ant *Shaw*, he delivers three fourths of the tobacco to the con-
signee, and retains the remainder as security for the freight
and primage of the whole. In all this, he has acted in ac-
cordance with the settled law, as it has appeared to me from
the cases I have cited; and I am of opinion, therefore, that
the judgment of the court below ought to be affirmed, so far
as it decrees to the master the payment of his expenses and
disbursements.

By Mr. Senator SHERMAN. The right of the defendant
in error to recover in the court below has been questioned
on various grounds taken by counsel; but the important
question is, was the captain of the brig William Henry justi-

fiable in detaining the 50 hogsheads of tobacco, a part of her cargo, for his own indemnity? and this must depend on the question whether he has a lien upon the freight as against the owner for necessary repairs and supplies procured for the vessel in a foreign port, upon his personal liability.

A question was raised as to the effect of the libel filed in the district court of the United States. The object of this libel was to settle the title to the vessel, and to recover possession of her by Shaw, to whom she had been sold in the absence of the captain; and as he was a party to that libel suit, it was contended he is barred from recovering here. The only question settled by that court was the ownership of the vessel. The question of lien on the freight did not come before that court nor enter into its decision; nor was Depau a party to that libel, from whom the freight was due as consignee.

Another point made in this case was, that Ingersoll, the captain, was a trespasser in proceeding to New-Orleans with the vessel, and, acting in his own wrong, was not entitled to the claim he has set up in this case. This point is not, I think, sustained by the facts of the case. He was regularly employed by the former owners, or their agents, and took possession on the 3d of July, 1822, before the date of Shaw's bill of sale; and Shaw, instead of rescinding his command afterwards, acquiesced in the voyage, and stated in the libel which he filed that Ingersoll took command of the vessel by virtue of the agreement with the former owner, and was at the time of the conveyance to him, and continued to be the commander thereof.

It further appears that Shaw received the earnings of the vessel after her arrival at New-York, and that the conduct of the captain was that of a judicious, prudent and careful master.

The main question then is, has a captain of a vessel a lien on the freight for necessary disbursements and liabilities entered into in a foreign port on account of such vessel?

The captain is always the agent of the owner of the ship; but not of the cargo, unless specially so created, or unless from necessity he is obliged to act in the capacity of captain

and supercargo. The freight or earnings of the vessel belongs to the owner, and he or the captain as his agent has a a lien upon and a right to detain the goods shipped until the freight money is paid.

The captain's claim for his own wages is founded upon his contract with the owner; and being a personal claim, he has no lien upon the ship in case they are not paid; but his claim against the owner for necessary disbursements and repairs for the ship abroad is not founded on contract, but arises from necessity and rests upon a different principle. It is settled law, and has never been disputed, that a person furnishing repairs or necessaries for a ship in a foreign port has a three-fold claim: a right of action against the captain, against the owner, and a lien upon the ship and cargo; and that the captain, in order to pay for such necessary repairs and charges, may hypothecate the vessel, cargo and freight, by bottomry or respondentia bond; that such a bond is a lien upon the ship and cargo and follows her home, and has a right to be paid before any other claim except seamen's wages. If the captain has this power, what reason is there why he should not have the same lien in case he pays for the repairs with his own money, or becomes personally liable for them? Does he not stand in the same light as the person advancing money on bottomry?

It is a principle of law, if one man holds a lien on property, and another acting as the agent of the owner of the property discharges the claim, he becomes entitled to all the rights of the lien holder. But it has been said that the principle of giving the captain a lien under the circumstances of this case would be embarrassing to commerce and the interest of merchants and ship owners. I apprehend no such consequences would follow. What would be the difference to the ship owner or consignee, or any one else interested in the vessel or cargo, whether the lien is held by the captain or the holder of a bottomry bond? If there is any difference, I apprehend it is in favor of the latter holding the lien; for a person advancing on bottomry may charge any rate of interest agreed upon without violating the usury law; whereas the captain would be confined to the legal rate of interest,

Besides, it may happen in a foreign port that no one can be

found willing to advance for or on account of the ship, and she be thus prevented from pursuing her voyage.

How does this case stand on the score of authorities?

In England there appears to have been some clashing opinions on the question, whether a captain of a vessel has a lien under circumstances similar to this case.

In 4 *Esp.* 22, Lord Kenyon, at nisi prius, decided that a captain who had made necessary advances for the ship in a foreign port and entered into liabilities, had a lien on the freight for his own indemnity. This was a question between the captain and the owner, or his assignees, to whom the consignee of the goods had paid the freight money.

In 3 *Robinson's Adm. Rep.* 240, Sir W. Scott says that a captain of a vessel in a foreign port, in order to make necessary repairs to enable him to proceed on the voyage, may bottomry ship, *cargo* and freight by a bond, to be paid in 24 hours after her return home; or he may, if it becomes necessary, sell any part of her cargo for that purpose.

*Hussey* v. *Christie*, 13 *Vesey, jun.,* 594, was a case in equity where the captain claimed a lien on the freight against the owner or his assignee, being an application by the owner for an injunction to restrain the consignee from paying over the freight to the captain, who claimed on the ground of having made disbursements for the ship abroad. The injunction was refused, the lord chancellor deciding that he had a lien on ship and cargo in such cases; and he observed, in delivering his opinion, that it may be very beneficial for owners that the master should be able to procure the repairs by his own means; for in some foreign ports he may not be able to find a person willing to advance on the credit of the ship; and because the captain cannot hypothecate to himself for advances, he shall for that reason have a lien when he does advance. This case was decided in 1807, and was sent down by the lord chancellor to the judges of the king's bench for their opinion. That opinion is reported in 9 *East,* 426. The judges decided that they knew of no case at common law giving the captain such a lien, and Lord Eldon says, " I disclaim the right now to originate one."

The case of *Atkinson* v. *Cotesworth*, 5 *Dowl. & Ryl.* 552, was decided upon the authority of the case above referred to, and is the case on which the counsel for the plaintiff in error principally depended. In 3 *Ves. & Beame*, in 1814, seven years afterwards, is another case in equity, of the lien claimed by the captain on the freight for repairs abroad. The lord chancellor again sanctioned the doctrine, and observed, "In such cases of repairs of ships the *authorities* seem to establish the lien." Hence it appears that the king's bench and the court of equity in England are at variance in opinion on this subject.

The American authorities generally go to establish the lien in favor of the captain.

The captain paid the export duties abroad which were necessary to enable the ship to proceed on her voyage—decided, that he had a lien on the freight for the same. 2 *Caines' Rep.* 81.

The United States district court decided that money paid abroad by the captain for mariners' wages and necessaries furnished the vessel are liens on the ship, and directed the same to be paid out of *remnants* and *surplus*. 1 *Peters' Adm. Rep.* 223.

Judge Story decided that the master of a ship has a lien on the freight for all advances made abroad for ships' use, and may intercept it to reimburse himself. 3 *Mason's Rep.* 255. He observes, alluding to the case in 9 *East*, 426, "It has been said that the common law affords no such lien in England ; but their courts of equity seem determined to uphold it. Our courts have on several occasions adopted and enforced it."

In 11 *Mass. Rep.* 72, the same principle is sanctioned. The captain's right to retain may be enforced against the owner himself.

It does not appear from the authorities referred to on either side that there was any settled common law in England on this question prior to the revolution. It was *res integra* before that period. It is important that this principle in our state should be established settled law, for the information

of that portion of the community more immediately inter- ested.

I cannot reconcile the principle of the English decision in 9 *East* to my ideas of justice ; that a captain of a ship, after encountering the perils of the sea and expending his money and incurring liabilities to repair the *ship* of his owner to enable him to complete the voyage and bring home *her* earnings, and on his return finds his owner a bankrupt and his effects made over to assignees, shall not only lose his wages, but the money he has expended, appears to me unjust. This, to be sure, is a strong case ; but a ship master is differently situated from a person employed on land, who can watch and look after his interest. Changes in the commercial community are frequent and sudden. In the present case the captain on his return home found that the ship had been sold to a stranger, residing in another state, and the consignee of the cargo notified not to pay him any portion of the freight money. These are strong circumstances shewing to my mind the propriety of a lien on the ship's earnings.

I am therefore of opinion that the judgment of the supreme court is right as far forth as it supports the master's claim for responsibilities assumed by him ; but that the court erred in allowing the plaintiff below to recover for his wages.

By Mr. Senator Todd. Under the facts in this case, the plaintiff in the court below contended that as master he had a general lien on the goods as well as on the freight for his wages and the amount of moneys expended on the brig for repairs and other necessary charges. Two questions arise out of this claim : 1. Whether he has any lien as against the owner of the brig for *wages* ; 2. Whether he has a lien for *repairs and moneys expended* on the brig to indemnify himself for his individual liability.

The first branch of the inquiry has often been a subject of judicial determination, and many cases are to be found which bear strongly upon it, and it usually is determined from the relation which exists between the owner and master. The master is the agent of the owner, is in his employment, and whatever he does must be for the benefit of his employer.

NEW-YORK,
Sept. 1830.

Van Bokkelin
v.
Ingersoll.

The agent cannot upon any principle interpose and prevent the owner from receiving the freight which his vessel has earned. It is true the charterer may pay the freight to the master, and this will discharge him from liability to the owner. This, however, must be understood as applicable to the case where the owner is merely passive and does not interpose and claim the paymant to be made directly to him. Wherever such a claim is interposed, the freight must be paid to him to whom it is due, and a payment to the master would be no discharge. The master's lien for wages can only attach upon the freight when he has received it; he then can retain it as against the owner, and not before. A different rule would present the case of a discharged master interposing his claim and preventing the freighter from paying freight to the owner, and indeed enable him to maintain his action of trover for the goods, if his claim was not settled. It cannot be necessary for the security of the master, and commercial policy would not sanction such a rule; his contract with the owner is upon his personal liability, and he gains no lien until he actually receives freight, and upon that it attaches. The following cases support the rule which I have stated : *Wilkins* v. *Carmichael, Doug.* 105. Lord Mansfield, in delivering the opinion of the court, says, " As to wages, there was no particular contract that the ship should be a pledge ; there is no usage in trade to that purport, nor any implication from the nature of the dealing. On the contrary, the law has always considered the captain as contracting personally with the owner." *Smith* v. *Plummer,* 1 *Barn. & Ald.* 575. *Hussey* v. *Christie,* 9 *East,* 426. *Abbott on Ship. by Story,* 142. *Atkinson* v. *Cotesworth,* 5 *Dowl. & Ryl.* 552.

The other branch of inquiry is, how far can the master retain to satisfy his claim for *moneys expended* on the ship, or has he a lien on the *goods* for such repairs as are necessary, and moneys paid for the use of the ship, and which he has either paid out of his own money or become personally liable to pay. The master has the power of hypothecating both vessel and cargo for debts accrued on the ship's account. Upon general principles, I can see no difference between the master having a lien for moneys expended, and giving that

NEW-YORK,
Sept. 1830.

Van Bokkelin
v.
Ingersoll.

lien to another who expends his money for the same purpose. It can make no difference with the owner to whom he is indebted for the repairs, whether to a foreign capitalists or to the captain. As a matter of convenience to the owner, his interest would be promoted by permitting the captain to have the lien, affording a much more convenient opportunity of paying off the incumbrance to him than to a foreigner. The lien of the foreigner ceases when he permits the vessel to go out of his possession ; so would that of the captain ; but so long as he retains possession of the vessel or cargo, so long his lien will remain. In this case the defendant in error did retain possession of the goods on the ground of enforcing his claim for moneys expended on the vessel and for her use. I think he had a right so to retain possession, and that he can maintain this action against the person with whom the goods were deposited for the amount of such claim, he having delivered them to the owner, but that he could not so retain for *wages;* and to the extent of the. wages allowed, the judgment should be reversed and affirmed for the residue.

There are some strong reasons against the conclusion to which I have come. It is said, and with truth, that much inconvenience would arise to the owner if he could not remove the master, let his conduct be ever so improper, (and indeed, owing to the conduct of the master, the expenses may have become necessary,) still it is better to leave that matter to be adjusted in some appropriate tribunal, than to displace the captain from the vessel, in the repairs of which he may have expended large sums of money, and become more interested in her preservation than even the owner.

There is another strong objection to this action, arising from the liability of the owner to the person making the repairs : for the person making the repairs has a triple remedy against the vessel, against the captain, and against the owner ; and if the captain recovers against the owner, and misapplies the proceeds of such recovery, the claim of the person making the advances still remains against the owner ; he is thus liable to be prosecuted in two suits ; and it is questionable how far one suit would be a bar to the other. This is the general rule, but where the credit is given to the own-

er, the captain is not liable, *Farmer* v. *Davies*, 1 *T. R.* 108; and it would seem that the same reasons should operate to exonerate the owner, where the credit was given to the captain. In this case the disbursements were made by William Kennon & Co. on the responsibility of the captain, and his note was taken when the account was liquidated. It certainly could not have been that these disbursements were made on the responsibility of *Shaw*, the true owner; because he did not become the owner until the 22d July, 1822, and it could not have been known to Kennon & Co. that he was owner, and especially as the brig was consigned on the 8th June, on behalf of *Driggs*, the pretended owner. Their acceptance of Ingersoll's note and parting with the lien they had on the brig would undoubtedly discharge the brig from their lien; and under the circumstances in this case, I think also that Shaw would not be liable to Kennon & Co. for the amount of their disbursements.

The current of recent authorities is that the captain has a lien on the *goods* for the disbursements made for the vessel; *White* v. *Baring et al.*, 4 *Esp. N. P.* 22, is a strong case to this point; it is true it is only a nisi prius case, and is entitled to no more respect than is usually accorded to such decisions. Lord Kenyon, in that case, says that the captain having made himself *liable* for articles furnished to the ship, acquired a lien on the goods and freight, and that such lien was coextensive with the *liability* to the ship's creditors. The following American cases proceed upon the same ground: *Lane* v. *Penniman*, 4 *Mass. Rep.* 92; *Lewis* v. *Hancock & Winslow*, 11 *id.* 72; *Canning* v. *Snow*, 11 *id.* 415; *Milward* v. *Hallet*, 2 *Caines*, 77.

The verdict in this case embracing the *wages* as well as the *primage* and *responsibilities*, and judgment having been rendered for the whole amount, is must be reversed.

On the question being put, it appeared that the members of the court were *unanimously* of opinion that the judgment of the supreme court was *erroneous* in allowing the master to recover for his *wages*, but that for the residue the judgment was right.

Whereupon a question arose whether the judgment of the supreme court would be *affirmed* in part and *reversed* in part, and at a subsequent day,

The CHANCELLOR stated the rule to be, that when *distinct* judgments are given by the court below, as for instance a judgment for *damages* and a judgment for *costs*, one may be reversed and the other affirmed; but when the judgment is *entire*, there must be a total affirmance or reversal. 8 *Johns. R.* 111, 558. 12 *id.* 340, 434. 13 *id.* 460. 14 *id.* 417. In the special verdict in this case, the jury had stated the several amounts of the several items, but yet if the supreme court should be of opinion that the plaintiff was entitled to recover, they assessed his damages at a *gross* sum, and for that sum the court had given judgment. The judgment therefore as to the damages was *entire*, and there must be a *total reversal*, with directions to the supreme court to award a *venire de novo*, so that the jury on the second trial might be instructed not to allow for the master's *wages* in the verdict that they should pronounce.

It was thereupon allowed that the judgment of the supreme court must be reversed *in toto* with costs; whereupon a decree was entered to that effect, and by consent of parties the following addition was made thereto: that a *venire de novo* be awarded by the supreme court, unless the defendant in error remit $140 (the amount of the master's *wages*) and the interest of that sum from the time of the termination of the voyage down to the time of rendering the verdict; and if the defendant do so, then that the supreme court give judgment for the balance of the damages included in the verdict, with costs in the supreme court.