CATHARINE JENKINS, ADMINISTRATRIX, AND THOMAS G. WAIT, ADMINISTRATOR, ETC., RESPONDENTS, v. DAVID E. WHEELER, APPELLANT.

*Master of Vessel—Contract for Services—Lien—Condition precedent.*

The master of a vessel has no lien on the vessel for his wages; he contracts upon the credit of the owners thereof. Per Davies, J.

The doctrine of mariners' contracts, seamen's wages, &c., that freight is the mother of wages, does not apply to the contract of the master for wages.

Where the master was engaged for a round voyage, and the vessel was lost, held, that the Captain could recover wages only for the time employed as master of the vessel; and that the breaking up of the voyage by the loss of the vessel, terminated his employment as Captain, and that he could not recover for wages after that time.

*J. W. Edmonds* for Appellant.
*C. N. Black* for Respondents.

DAVIES, CH.J.—Oliver N. Jenkins, the Plaintiff's intestate, was employed by one Anthony Pelletier to take charge of the bark Peytona, then lying in the port of New York, on her then contemplated voyage to Australia. The title of the bark then stood in the name of the Defendant as owner, although, in fact, he was not such owner. On the 8th day of February, 1853, the Defendant, in whose name the title to the bark stood, and Jenkins, entered into an agreement substantially as follows: The said Jenkins thereby agreed to and with the Defendant, to take charge of the bark Peytona, then lying in the port of New York, for her then present voyage to Australia, and return to New York, according to instructions given him by Anthony Pelletier; and Jenkins agreed to use his best efforts for the interests of the said bark and owners.

And the Defendant covenanted and agreed that he would pay to Jenkins, in consideration of said services, the sum of one hundred and fifty dollars for each and every month of said period during said outward and return voyage.

The bark was owned by said Pelletier, and Overman & Gruner;

and they were the persons beneficially interested in said voyage.

The instructions of Pelletier to Jenkins, under date of Feb. 7, 1853, are set out in the case, and show fully that Pelletier assumed the sole control and direction of the voyage. The Defendant offered to prove on the trial that this agreement between himself and Jenkins was signed by him solely for and on behalf of said Pelletier, Overman & Gruner; that they were the only persons beneficially interested in said bark Peytona; that the Defendant had no beneficial interest in her or her cargo or voyage; that he was not interested in or connected with any other ships or mercantile business; and was connected with said bark Peytona only as holding the naked legal title to her, for and on behalf of said Pelletier, Overman & Gruner; that all these facts were known to said Jenkins, and to all parties having dealings with said bark Peytona, or her owners, before said agreement in suit was executed; and that Jenkins, in making such agreement, gave credit to and relied upon the responsibility of said Pelletier, Overman & Gruner, and not upon that of the Defendant.

To this evidence the Plaintiffs' counsel objected, and upon such objection the same was excluded. In the further consideration of this case, we shall assume that the matter so offered in evidence, and excluded on the Plaintiffs' objection, was true, and could have been proven. The bark Peytona sailed on her intended voyage from the port of New York soon after the date of said agreement, and was compelled, in the judgment of the master, to put into the port of Bahia, South America, by reason of shortness of water. After leaving Bahia the vessel put into Cape Town, on the coast of Africa, for water and fresh provisions. After leaving Cape Town, the bark encountered heavy winds and lost her rudder; and the vessel leaked, and the captain then put into Port Louis, on the island of Mauritius, where he arrived on the 16th of August, 1853. On the 8th of September following, the captain abandoned the vessel to the underwriters, and she was advertised for sale; and the further voyage was then abandoned. The Judge, at the trial, instructed the jury that the Plaintiffs (in whose name

the suit had been revived upon the death of Jenkins) was entitled to recover of the Defendant $150 a month, from February 8, 1853, to November 25, 1853, and for such further period of time as would be reasonably required for Captain Jenkins to return to New York from Mauritius, by the first usual mode of conveyance that presented itself after November 25, 1853, with interest on the aggregate amount from February 14, 1855, unless the voyage was broken up through the unskilfulness, negligence, fault, or fraud of Captain Jenkins, in which event the Defendant was entitled to a verdict; or unless some damage had accrued to the Defendant from the fault, negligence, unskilfulness, or fraud of the Captain in the line of his duty.

The Defendant claimed that the voyage was broken up by reason of the negligence, unskilfulness, neglect, fraud, and fault of the Captain in this : ·

*First.* That the vessel could have been repaired and proceeded on her voyage, and therefore the Captain was not justified in abandoning her, and causing her to be advertised for sale.

*Second.* That the Captain, without good cause, deviated twice from the course of the voyage, and put into Bahia and Cape Town, and remained there longer than was necessary, and thereby caused the vessel to encounter the storm which was the immediate cause of the necessity of putting into Mauritius.

The Judge charged that, if the jury should find both that the Captain could have procured sufficient means to repair the vessel, and that under all the circumstances it was best for the interests of the owners that she should be repaired at Mauritius, then their verdict was to be for the Defendant. If, however, they should find either that the Captain could not procure sufficient means to repair the vessel, or if he could that it was not for the best interests of the owners to have the repairs made at Mauritius, then the Captain was justified in abandoning the vessel and advertising her for sale; and the Judge further charged, that if, after taking all the matter referred to into consideration, with the other facts proved in the case, the jury should come to the conclusion that means could have been raised for making these repairs, and that it was

for the best interests of the owners that the repairs should have been made at the port of Mauritius, then that disposed of the case in favor of the Defendant, and there was no necessity of considering the other matters set up in his defence. If, however, the jury should come to a contrary conclusion, then, in order to find for the Defendant, they would consider the second claim of the Defendant, which was whether the Captain, without good cause, deviated from his course to put into Bahia and into Cape Town, and remained there longer than was necessary, and by such deviation contributed to the disaster which finally compelled the ship to put into Mauritius. And he also charged, that if the jury should find that the Captain, without just cause, did deviate from the proper course laid down for the prosecution of the voyage, and did remain longer than was necessary, and that these two things contributed to the final disaster, then, in that event, the jury were directed to find their verdict for the Defendant. He further charged, that if the jury should find against the Defendant upon these three points, then that they should find for the Plaintiffs, unless, by reason of some further negligence or unskilfulness of the Captain in the line of his duty, some damage had occurred to the owners, and that, in that case, the jury should inquire what the damage was, and deduct the amount from what the Captain would otherwise be entitled to recover, and give a verdict for the balance in favor of the Plaintiffs.

The Defendant excepted to the charge, as to the time for which wages were recoverable, on the ground that, if recoverable at all, they could not be recovered for a longer period than from the inception of the contract sued on to the breaking up of the voyage.

The Defendant also excepted to that portion of the charge which stated that the Plaintiff was entitled to recover unless the voyage was broken up through the unskilfulness, negligence, fault or fraud of Captain Jenkins. Also, to that portion of the charge in reference to the first and second claims set up by the Defendant; and also as to what the Judge charged the jury, in reference to the damage sustained by the owners, arising from the

negligence or unskilfulness of the Captain, or from the unjustifiable deviations (if the jury should find such deviations unjustifiable) made by the Captain in the prosecution of the voyage. The jury found a verdict for the Plaintiffs for the sum of $5,285—thus allowing the Captain his monthly wages, as specified in the contract with the Defendant, up to October 11, 1854, the time of his arrival in the port of New York, and interest on that sum from February 14, 1855.

Judgment was entered at the Special Term of the New York Supreme Court, in accordance with the verdict, for the Plaintiffs, and on appeal to the General Term of that Court, the judgment, by consent of the Plaintiffs, was modified by deducting therefrom the amount allowed the Plaintiffs for the wages of the intestate from May 27, 1854, to October 11, 1854, amounting to $675, with interest from February 14, 1855, amounting, in all, to the sum of $1,195.53; and the General Term affirmed the judgment with such deductions.

The verdict of the jury must be taken and assumed to have established the following facts in this action:

1. That the voyage in question was not broken up through the unskilfulness, negligence, fault or fraud of Captain Jenkins.

2. That the vessel could not have been repaired at Mauritius, and have proceeded from thence on her contemplated voyage to Australia; and that the Captain was justified in abandoning the vessel, and such voyage, at Mauritius, and causing the vessel to be there advertised for sale.

3. That the Captain did not deviate twice from the course of his voyage, by putting into Bahia and Cape Town, without good cause; and that he did not remain in those places longer than was necessary, and that such deviations and delays were without fault on his part.

4. That the owners of said bark did not sustain any damage by reason of the fault, negligence, or unskilfulness of the Captain in the line of his duty.

These facts being established, if no error was committed upon the trial, it would follow, as a necessary consequence, that the

Captain, if entitled to recover at all, was entitled to recover the wages agreed upon from the Defendant, so long as he continued in command of the vessel.

We are to bear in mind, however, in looking into the rights of the Captain, that they arise and grow out of the contract made with the Defendant, so far as any liability on his part exists.

The law of England, and that of this country, holds that the master has no lien on the ship for his wages, and it is now definitely and clearly settled in England, that the master contracts upon the credit of the owner, and not of the ship, and that he has no lien on the ship, freight, or cargo for any debt of his own, as for wages, or stores purchased, or repairs done at his expense, either at home or on the voyage. The reason for this laid down in the books of the common law is, that although mariners are supposed to contract on the credit of their ships, the master's contract is altogether of a personal nature, on the credit of the owner (12 Mod. R. 405; Read *v.* Chapman, 2 Strange, 937; Ragg *v.* King, id. 858; Clay *v.* Sudgrave, 1 Salk, 33; S. C. 1 Ld. Ray. 576, and Carth. 518; Curtis' Rights, &c., p. 252; 3 Kent's Com., p. 166).

Chancellor Kent thought this doctrine in the English law remained yet to be definitely settled and declared in this country, and refers to various cases in which the English authorities have either been overruled, questioned, or qualified by the Judges in the United States. But he says that, by the case of Van Bokkelin *v.* Ingersoll (5 Wend. 315), as settled in the Court of Errors in New York, the English law was recognized, that the master had no lien on the freight, nor on the vessel, for his wages. If it were necessary to the decision of this case, we should feel bound to adhere to the doctrine thus promulgated by the highest Court of this State as the law of this State, and which has been a recognized rule of law therein for nearly forty years. The master's contract is therefore to be governed by and construed by the same rules of law as are applicable to other contracts. The doctrine in relation to mariners' contracts, and to those of seamen for wages, and the maxim that "freight is the mother of

wages," have no relevancy or application whatever to the con-
tract of a master for his compensation as such.　That contract is
to be governed by its terms, and by the same rules which are
applied to the construction of all other contracts.　By the
terms of Captain Jenkins' contract with the Defendant, he
agreed to take charge of the vessel, and be governed in the dis-
charge of his duties, as master thereof, according to the instruc-
tions given to him by Pelletier, and to use his best efforts for the
interests of the said bark and owners.　A faithful compliance
with these terms was a condition precedent to his right to de-
mand and receive the stipulated wages.　The case of Van
Bokkelin *v.* Ingersoll (supra) held that the Captain, to entitle
himself to his wages, must show that his conduct was that
of a prudent, judicious, and careful master.　The Judge at
the trial therefore properly told the jury that the Plain-
tiffs could not recover if the voyage was broken up through
the unskilfulness, negligence, fault or fraud of Captain Jenkins.
In Macy *v.* Wheeler (30 N. Y. 231), which was an action for
supplies furnished this same vessel, where the same facts appeared
as to the ownership of this vessel as were given in evidence
or offered in evidence upon the trial of this action, this Court
held, that it was indubitably established that Pelletier was the
real owner of the vessel, both before and after the transfer to the
Defendant; that the Defendant had no interest in her or her
earnings, and that they belonged to Pelletier, or those to whom
he transferred them.　That under these circumstances the De-
fendant was not liable for supplies, unless purchased by him, or
by some person authorized by him.

Applying the doctrine of this case to the one now under exami-
nation, it follows that, independent of the contract given in evi-
dence, there would be no liability whatever on the part of the
Defendant for any wages due the Captain, or for services rendered
by him for or on account of this vessel or her owners, or for their
benefit.　No implied promise, therefore, could be raised that the
Defendant was to pay for the same, as Captain Jenkins well knew
the special relations this Defendant held to said vessel, and to her

owners. And it also follows that, whatever may be the liability of the owners to the Captain for services rendered on a quantum meruit, or on implied assumpsit, the Defendant's liability can alone spring from, and must be measured by his contract. But it was competent for the Defendant to stipulate and agree to pay either the Captain's wages or to pay for supplies furnished the vessel, or any other liability which he might elect to incur; such agreement or undertaking was in its nature collateral to the primary liability of the owners for the debt, which, was in fact theirs. The position of the Defendant in this action is that of surety for the owners, who are primarily bound to pay and discharge the wages of the captain employed by them to navigate their vessel, and for their benefit. In this aspect we are to regard the Defendant's undertaking, and the liability arising therefrom. A careful examination of the contract entered into between the parties will show what each contracted to perform, and the liabilities imposed thereby upon each. Captain Jenkins agreed, on his part, to take charge of the bark for her then present voyage to Australia and return to New York, according to the instructions given to him by Pelletier. By reference to them, it will be seen that a round voyage was contemplated from New York to Australia and back. And in consideration of the said services the Defendant agreed to pay Jenkins the sum of $150 per month for each and every month of said period during said outward and return voyage. This contract was entire, and for the round voyage, and unless there was full performance on the part of Jenkins, the Defendant cannot be called upon, in accordance with the terms of his contract, for payment as for a part performance. The current of decision on this question is too uniform, and the principles settled too firmly established, to permit them to be questioned or departed from.

It is needless to go outside of the discussion had upon this question in this State. The case of McMillan *v.* Vanderlip (12 John. 165) contains an elaborate review of the English cases, and enunciated the settled rule of law with precision and entire accuracy. In that case the agreement was that the Defendants were to

pay Vanderlip 3 cents per run for spinning, and that he was to work for them 10½ months, and the Plaintiff claimed for spinning 845 runs at 3 cents per run.   The question was whether the contract was an entire contract, performed on the part of the Plaintiff, operating as a condition precedent, or whether the agreement to pay 3 cents a run on one side, and the promise to work for 10½ months on the other, were independent and unconnected with the rate at which the Defendant was to spin.   Judge Spencer said : " It is evident to my mind that the parties before us intended that Vanderlip should serve the McMillans for 10½ months, and that he should be paid 3 cents for each run of yarn spun by him, and that they intended this as one entire contract. * * * If the contract was entire, and looked as well to the price per run as to the time of service, it necessarily formed a condition precedent ; and then Vanderlip could not sue until he had performed his contract of service, or until the period within which it was to be performed had elapsed."   In view of this authority, we must regard the contract in the present case as one entire contract, and that the rate per month stipulated therein was to be paid on full performance of the condition precedent on the part of Jenkins, namely : the services as master of the vessel for the whole period of the round voyage.   In Reab *v.* Moor (19 John. 337), affirmed in the Court of Errors, this case of McMillan *v.* Vanderlip was cited with approbation, and it was held, that when M. had contracted to work for R. for eight months for 104 dollars, or 13 dollars a month, that the performance of the work was a condition precedent, and that M. could not recover for three months' work performed.

It was also held, that the written contract between the parties was an entire contract of hiring for eight months, at a stipulated price.   That M. was to work eight months for R., for which R. was to pay him 104 dollars, or 13 dollars a month—not 13 dollars at the end of every month, but the entire sum of 104 dollars to be paid was to be equal to that rate of compensation.   So in the case at bar, it is clear that the monthly rate fixed was not to be paid at the expiration of every month ; but when the round voyage

was completed, Jenkins was to be paid at that rate for the time necessarily consumed in making it. See also Webb v. Duckingfield (13 John. 390); Burrill v. Cleeman (17 John. 72). In the latter case, the action was brought upon a covenant to a charter party. The Defendant agreed for the charter and hire of the vessel from New York to Pernambuco and back for the sum of $1,400 on delivery of the return cargo, on arrival of the vessel at New York. The vessel went to Pernambuco, but in consequence of the port being blockaded, could not land the outward cargo or take in a return cargo, but returned to New York with the cargo as originally laden on the vessel. Van Ness, J., in the opinion of the Court, said: "The freight stipulated to be paid by the charter party depended upon the performance of the voyage, and was a condition precedent to the freight being payable; and this condition not having been performed, the freight cannot be recovered." To the same effect are the following cases: Lantry v. Parks (8 Cowen, 63); Monell v. Burns (4 Denio, 121). It will now be convenient to examine the doctrine settled by this Court upon this question. This subject received a very thorough discussion in the learned and exhaustive opinion of Comstock, J., in Smith v. Brady (17 N. Y. 173). It contained a review of the authorities, and deduces from them this principle: That according to the settled law of this State, a Plaintiff cannot recover the payments which, by the terms of a true construction of the contract, are due only on condition of performance by him, unless he can show such performance, or prove that it has been waived.

The same doctrine was reiterated in Cunningham v. Jones (20 N. Y. 486). In that case it was held that the contract (an agreement to erect a brewery upon the Defendant's land, without any stipulation or agreement as to the time and manner of payment, except that the labor was to be performed by day's work) was an entire one, and indivisible, and that the contractor was not entitled to recover without a full performance on his part. It matters not that no price was fixed upon as a compensation. The Defendant had a right to insist, before he was called upon to pay, that the contract should be first performed. The same doctrine

was reaffirmed in Baker v. Higgins (21 N. Y. 397). It is deemed clear that, by the terms of this contract, the Defendant agreed to compensate the Plaintiffs' intestate for the round voyage, at a certain rate of compensation per month for the time thus employed in fulfilling the contract, and that such compensation was not due and payable until the performance on the part of Jenkins of the conditions precedent to such payment.

In Oakley v. Morton (11. N. Y. R. 25), this Court decided that a condition precedent must be strictly performed to entitle a party to recover. Judge Allen, in his opinion, said: " Whenever a party by his own contract creates a duty or charge upon himself he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract " (citing numerous authorities). Judge Johnson, in the same case, said: " The performance must be exact, not cy près."

The voyage which Plaintiffs' intestate agreed to perform was not made. It is clear upon all the authorities that they cannot recover, unless some valid and legal excuse is shown for the nonperformance by him. The Plaintiffs claim that the interruption of the voyage, and the sale of the vessel at Mauritius, furnish such an excuse. To this the Defendant is at liberty to say, " Non in hoc fœdere veni." Inevitable accident on the part of a third party is not an adequate excuse. The fault of the Defendant alone is available for such a purpose. As was correctly observed in the case last cited, such " accident by inevitable necessity is not available, because he might have provided against it by his contract."

This Court decided, in Harmony v. Bingham (12 N. Y. 99), that when a party unconditionally, by express contract, agrees to do an act, performance is not excused by inevitable accident or other unforeseen contingency not within his control; and in the opinion of the Court, by Judge Edwards, it is said "that this rule has been uniformly followed, and that, too, even in cases in which its application has been considered by the Court as attended with great hardship. The only exception which has ever been

acknowledged, is where a party has contracted to do a thing which the law considers impossible."

Judge Ruggles said : " It is a well-settled rule of law, that where a party, by his own contract, absolutely engages to do an act, it is deemed to be his own fault and folly that he did not thereby expressly provide against contingencies, and exempt himself from responsibility in certain events. And in such a case, therefore—that is, in the instance of an absolute and general contract—the performance is not excused by an inevitable accident, or other contingency, although not foreseen by or within the control of the party." The same doctrine was enunciated by this Court in Tompkins *v.* Dudley (25. N. Y. 272). There the Plaintiffs, as trustees of a school district, sued to recover moneys advanced by them toward the erection of a school-house, paid on account to one Chambers, who had contracted with Plaintiffs to erect and build it for a certain sum, and the Defendant had guaranteed the faithful performance of the contract by Chambers. Before the building was entirely completed, it was destroyed by fire. This Court held that the Plaintiffs were entitled to recover, and that the justification for non-performance, the destruction of the building by fire and inevitable accident, without any fault on the part of the contractor, was no legal justification for the non-performance of the contract. The case of Adams *v.* Nichols (19 Pick. 275) was referred to. In that case Morton, J., in delivering the opinion of the Court, said : " The Defendants do not pretend that they have executed their contract to build a house for the Plaintiff, but contend that the facts disclosed furnish a legal excuse for not doing it. . . . In these and similar cases, which seem hard and oppressive, the law does no more than enforce the exact contract entered into. If there was any hardship, it arises from the indiscretion or want of foresight of the suffering party. It is not the province of the law to release persons from the improvidence of their own acts." In harmony with these principles is the case of School Dist. No. 1 *v.* Dauchy (25 Conn. 530), and also an instructive case of School Trustees of Trenton *v.* Bennett (3 Dutcher, N. J. 514). The Supreme Court of that State in its opinion says :

" No rule of law is more firmly established by a long train of decisions than this, that where a party, by his own *contract*, creates a duty or charge upon himself, he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." In reference to the hardship of such a rule, the Court very justly says : " No matter how harsh and apparently unjust in its operation the rule may occasionally be, it cannot be denied that it has its foundation in good sense and inflexible honesty. He that agrees to do an act should *do it*, unless absolutely impossible. He should provide against contingencies in his contract. Where one of two innocent persons must sustain a loss, the law casts it upon him who has agreed to sustain it, or rather the law leaves it where the agreement of the parties has put it. The law will not insert, for the benefit of one of the parties, by construction, an exception which the parties have not, either by design or neglect, inserted in their engagement." To the same purport is the law of Catlin v. Tobias (26 N. Y. 217).

It logically follows from these authorities that the contract of the Plaintiffs' intestate with the Defendant was for the round voyage and an entirety, and that the compensation therein specified was to be made upon its performance ; that such performance was a condition precedent, and no action could be maintained until such performance had taken place, unless the party upon whom such performance rested established a valid and legal excuse for such omission or non-performance ; that none such has been shown in this case, and, as a consequence, neither the Plaintiffs nor their intestate are entitled to claim such compensation. If these views are concurred in, it follows that the judgment appealed from must be reversed, and a new trial ordered, costs to abide the event.

The majority of the Judges are, however, of the opinion that the points discussed in the preceding opinion were not raised upon the trial of this action, and therefore are not now available to the Defendant. But they are of the opinion that the exception to the charge, as to the time for which wages were recoverable, if

recoverable at all, that they could not be recovered for a longer period than the inception of the contract sued on to the breaking up of the voyage, presents the question distinctly for what period of time the Plaintiffs are entitled to recover wages of the Captain from the Defendant. This Court is of the opinion that such recovery must be confined to the period during which Captain Jenkins performèd the service as master, namely : from the time of the inception of the voyage, on the 8th day of February, 1853, to the date of its abandonment and breaking up, on the 8th of September, 1853.

The judgment appealed from is therefore affirmed, without costs of this appeal, if Plaintiffs elect and consent to deduct all allowances for wages after September 8, 1853, and interest thereon included in the judgment. If they do not so elect and consent within twenty days after notice of this judgment, the said judgment is reversed and a new trial ordered, costs to abide the event.

WRIGHT, PORTER, FULLERTON, and PARKER, JJ., concur in reversing, unless there is a reduction of damages to compensation while actually navigating vessel.

Affirmed, conditionally.

HUNT, J., and GROVER, J., dissent.